### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Case No.

**REX TREWIN,**

      Plaintiff,

v.

**WIPRO ENTERPRISES LIMITED d/b/a WIPRO LIMITED, WIPRO TECHONOLOGIES, and WIPRO LIMITED,**

      Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Rex Trewin, by and through undersigned counsel, files this Complaint against Defendant Wipro, LLC d/b/a Wipro Limited (herein "Wipro" or Defendant").

### I.      JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, and 28 U.S.C. §1343(a)(3) and (4), which grant original jurisdiction to the Federal District Court in actions which arise under federal civil rights laws.  Specifically, this Court has jurisdiction pursuant to the enforcement provisions of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601 *et seq*.

2.      Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendant is authorized to do business and does business in the District of Colorado, and is therefore subject to personal

jurisdiction.

## II.    ADMINISTRATIVE PREREQUISITES

3.    Mr. Trewin filed a Charge of Discrimination with the EEOC against Defendant Wipro (Charge No. 541-2016-02283) on or around August 5, 2016, alleging discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964 and retaliation in violation of the American's with Disabilities Act of 1990.

4.    The EEOC is investigating multiple complaints against Defendant and has consolidated the investigation at the Newark, New Jersey EEOC office.

5.    Mr. Trewin has not yet received his Notice of Right to Sue from the EEOC on his claims of discrimination and retaliation.

6.    Mr. Trewin will amend this Complaint to reflect administrative exhaustion of his Title VII charge as soon as the Notice of Right to Sue is received.

## III.    PARTIES

7.    Mr. Trewin is a resident of and domiciled in the State of Colorado.

8.    Defendant is a foreign for-profit corporation that is authorized to do business in Colorado.

9.    Defendant is incorporated in Bangalore, India and is headquartered in Bengaluru, India at Doddakannelli, Sarjapur Road, Bengaluru 560035.

10.     Defendant has multiple office locations in the United States, including an office in Broomfield, Colorado.

## IV.     FACTUAL ALLEGATIONS

*General Allegations*

11.      Mr. Trewin has over 20 years of campus relations and campus recruiting experience.

12.     In his prior roles, he developed new, successful recruiting programs for colleges and employers alike; his prior experience provided him with the necessary skills to excel in his position at Wipro.

13.     In March 2010, Mr. Trewin began his employment with Defendant as a Global University Recruiting Manager.

14.     Throughout his employment, Mr. Trewin typically worked from home.  As his job duties became less focused on American students, his physical location was less important.

15.      On average, Mr. Trewin was physically present in the Atlanta, Georgia office location twice a month.  His physical presence in Atlanta became less important after Defendant eliminated technical recruiting from his responsibilities.

16.     His target schools for recruiting MBA students were located around the country and required he travel to various regions.  His target schools did not include foreign schools where Defendant recruited students.

17.     Defendant had a pattern of ignoring Mr. Trewin's contributions or suggestions. Throughout his employment he stressed the importance of complying with employment laws and regulations.  When violations occurred, he informed his supervisor, Hamsa Bharwadja, former

Global B-School Hiring & Engagement Recruiting Director in the hope that appropriate action would be taken.

18.     Mr. Trewin was penalized for urging Defendant to comply with the laws which contributed to his termination.

*Defendant Continued To Give Mr. Trewin More Responsibilities Without Proper Staff Or Resources*

19.     During his employment, Mr. Trewin's responsibilities increased from recruiting undergraduate students located in the United States to recruiting MBA graduate students internationally.

20.     After a 2012 reorganization, Mr. Trewin's primary activities involved three programs – the Undergraduate Engineering Consulting program for the Energy, Natural Resources, Utilities plus Construction (ENU+C) Business Unit; Global Graduate Business Program; and the G100 Program exclusively for premier student from top 20 globally ranked MBA programs.

21.     His duties included any on-campus recruiting activities, scheduling, tracking all candidates, candidate offers, orientation arrangements, ongoing advising of new student hires, and counseling for up to two years after onboarding.

22.     Even though it was outside of his job description, Mr. Trewin maintained tracking of and approving the F-1 and J-1 international students within the United States and also continued to be the point of contact for such students and related managers.

23.     These procedures were important for students to maintain proper legal status.

24.     During that same time, Defendant transferred all technical hiring to a new team, but failed to properly staff the team.  Mr. Trewin was still required to fulfill Requests for Proposals which required some hires come from campuses outside of India.

25.     On several occasions, student hires and university career center staff mentioned how other companies had multiple people participating in the campus recruiting process, whereas Defendant did not.

26.     Other employees had difficulty managing only portions of one global program.

27.     Mr. Trewin became responsible for completing the tasks equivalent to a team of ten employees and was working approximately 100 hours a week.  Defendant refused to hire any support staff for Mr. Trewin after terminating his sole direct report.

28.     Mr. Trewin made a formal request for an intern to work for ten hours per week.  This request was denied.

29.     Defendant refused to provide Mr. Trewin with an assistant although non-American employees were given the necessary resources to complete their responsibilities.

*Mr. Trewin Continued To Perform His Duties Despite Defendant's Harassment, Reduction in Resources, and Lack of Direction*

30.     During his employment, an Indian peer stated that Mr. Trewin, "would be the boss" if he was also Indian.  Instead, Mr. Trewin was repeatedly responsible for training his multiple supervisors over the years.

31.     Mr. Trewin was constantly called names and blamed for the mistakes of his Indian colleagues.

32.   For example, Mr. Trewin requested permission to attend two recruiting events in New York City at NYU and Columbia, but two non-American peers were sent instead.

33.   Mr. Trewin provided his peers with his only set of recruiting booth materials and instructed them to take the same materials to both schools, as there was only one set and the schools were extremely close in proximity.  His non-American peers forgot the materials at NYU and therefore were not able to use the recruiting booth materials at Columbia.

34.   Mr. Trewin received a call from Defendant blaming him for the mistake.  He was screamed at for over an hour regarding a mistake that he did not commit and accused of not being able to do his job.

35.   In or around October 2015, Mr. Trewin filed a formal complaint with Defendant's ombudsmen regarding the harassment he was experiencing.

36.   The ombudsprocess provides a place for employees to disclose concerns of malpractice, impropriety, abuse, or wrongdoing.

37.   Mr. Trewin's complaint was dismissed.

38.   Mr. Trewin was very concerned that he was being penalized because he was an American citizen; he watched as non-Americans received much more favorable terms and conditions of employment.

39.   Mr. Trewin became afraid to answer his phone due to the frequent humiliating statements he was forced to endure from his supervisors, Ms. Bharwadja, and Santosh Karagada, current Senior Vice President of Human Resources & Global Head Strategic Hiring.

40.   Over time, Mr. Trewin limited his communciation with his supervisors to avoid being humiliated and bullied.

41.    Approximately one month after Mr. Trewin's formal complaint to Defendant's ombudsmen, in or around November 2015, Defendant substantially reduced Mr. Trewin's budget.  The lower budget created substantial hardship for Mr. Trewin.

42.    He was not afforded the same opportunities as his non-American peers to be involved in budget decisions.

43.    Unlike prior years, Mr. Trewin was not able to travel and meet with candidates in person, but he was still expected to recruit the same number of students.

44.    Mr. Trewin altered his interview process with the assistance of technology and successfully met his goals.

45.    In February 2016, Mr. Trewin attended the Midwest Strategy Case Competition at the University of Illinois Urbana-Champaign (UIUC), which is a well-attended event that draws students from all over the world.  The event was Mr. Trewin's only opportunity to visit the school's campus, although Defendant hired a significant number of students from the school.

46.    During the previous four years, Mr. Trewin served as a judge at the event.  As a result, he was asked to judge additional rounds, including the final round of the competition in 2016.

47.    Several months prior, in or around August 2015, Ms. Bharwadja, approved Mr. Trewin's attendance at the event as it was placed on the official campus calendar.

48.    Three days prior to the event, Ms. Bharwadja denied the airfare portion of his expense report.  The denial was unexpected and never discussed.

49.    At the time, Mr. Trewin believed the airfare denial was due to his budget being cut.  When UIUC was informed that his budget had been reduced, UIUC offered to pay for his airfare, hotel, and food expenses so that he could attend.

50.   Mr. Trewin immediately informed Ms. Bharwadja of UIUC's offer, but she did not acknowledge his email.

51.   At no time was Mr. Trewin informed that he was prohibited from attending the event.

52.   Thereafter, Mr. Trewin provided an expense report that was approved and properly paid out to him.

*Defendant Terminated Mr. Trewin Shortly After FMLA Leave Request*

53.   In November 2015, Mr. Trewin's mother was experiencing significant health issues and required substantial assistance.

54.   For months, Mr. Trewin's brother, a resident of Colorado, took on the role of their mother's primary caregiver.  Mr. Trewin desired to be with his family and to help his mother regain her health.

55.   On or around January 26, 2016, he shared this information with Leanna Nichole, Human Resources Program Manager.  She suggested that Mr. Trewin take FMLA leave to care for his mother.

56.   Mr. Trewin appreciated the support and agreed that it was the best choice for him and his family.

57.   He anticipated discussing FMLA leave when Ms. Bharwadja visited the United States during the week of February 14, 2016.  He scheduled a meeting during her trip.  Unfortunately, Ms. Bharwadja cancelled her trip causing him to postpone their conversation.

58.   On or around March 11, 2016, Mr. Trewin spoke with Aswini Oliver, former Human Resources Business Partner, regarding his mother's health and his desire to take leave.

59.     Ms. Oliver responded that Mr. Trewin should speak to Ms. Bharwadja immediately and agreed that he should take FMLA leave.

60.     The next morning, Friday, March 12, 2016, Mr. Trewin spoke with Ms. Bharwadja regarding his desire to take FMLA leave.

61.     Although Mr. Trewin explained his desire to take leave immediately, Ms. Bharwadja requested that Mr. Trewin wait until the next week so she could prepare for his absence.

62.     She mentioned the possibility of hiring a temporary employee or cross training Mr. Trewin's coworkers.  This response brought Mr. Trewin great relief.  He scheduled a follow up meeting for the next Friday.

63.     Due to the changes in his role and his mother's health, Mr. Trewin also mentioned the possibility of relocating to Colorado to Ms. Bharwadja.

64.     At all relevant times, Defendant had an office in Broomfield, Colorado, outside of Denver. Many recruiters had relocated to Defendant's other offices, including their Colorado location.

65.     Ms. Bharwadja was visibly upset by the request and Mr. Trewin immediately dropped the subject.

66.     Mr. Trewin scheduled the follow up meeting for Friday, March 17, 2016, and planned to begin FMLA leave immediately following the meeting.

67.     On March 17, 2016, neither Ms. Bharwadja nor any other agent or employee of Defendant, discussed FMLA leave with Mr. Trewin.  Instead, he was informed that Defendant had elected to terminate his employment.

68.     During the meeting, Ms. Bharwadja stated that Mr. Trewin's services were no longer needed and his termination was effective April 1, 2016.

69. Defendant later change the justification for termination by alleging to the EEOC, that Mr. Trewin's termination was a result of "integrity" issues surrounding his attendance at the Midwest strategy case competition at UIUC.

70. However, when employees are terminated by Defendant for "integrity" reasons they are escorted out of the building immediately. In this case, after notifying Mr. Trewin of his termination, Defendant requested that Mr. Trewin remain and assist with the transition of his duties to his replacement.

71. Defendant has engaged in a pattern and practice of the systematic termination of its American employees, in favor of Indian employees.

## FIRST CLAIM FOR RELIEF
### Interference under the Family and Medical Leave Act, 29 U.S.C. § 2611

72. Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

73. Plaintiff was entitled to FMLA protections, Defendant interfered with Plaintiff's right to take FMLA leave under the FMLA, and Defendant's interference was related to Plaintiff's right to such leave.

74. Mr. Trewin was at all relevant times an "eligible employee" as defined by the FMLA, 29 U.S.C. § 2611(2)(A), in that he had been employed by Defendant for more than 12 months and worked more than 1,250 hours in the 12 months preceding his request for FMLA leave to address his mother's serious medical condition.

75. Mr. Trewin discussed his need for FMLA leave with Defendant on March 12, 2016.

76. Thereafter, Defendant failed to further discuss FMLA leave with Mr. Trewin or provide additional information regarding his right to such leave.

77.     Defendant terminated the employment of Mr. Trewin on March 17, 2016.

78.     Defendant participated in unlawful employment practices and policies in violation of the Family and Medical Leave Act by interfering with Mr. Trewin's ability to take FMLA leave.

79.     Defendant willfully terminated Mr. Trewin's employment in violation of the FMLA.

80.     As a result of Defendant's unlawful interference with his right to take FMLA leave, Mr. Trewin has suffered economic and liquidated damages including but not limited to loss of wages and benefits.

81.     Defendant has a history of failing to comply with civil rights laws, such as Title VII and FMLA.

        WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this Honorable Court enter a judgment for the Plaintiff as follows:

    a.  An award of actual damages in amount to be determined at trial, including lost wages;

    b.  Liquidated damages;

    c.  An award of exemplary or punitive damages;

    d.  An award of reasonable attorneys' fees and costs;

    e.  An award of Plaintiff's pre- and post-judgment interest; and

    f.  Ordering such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 16th day of March 2018.

By: _/s Rachel E. Ellis_____
Rachel E. Ellis
Livelihood Law, LLC
3401 Quebec Street, Suite 6009
Denver, CO 80207
ree@livelihoodlaw.com